UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-10330-RGS

RIMOWA DISTRIBUTION, INC.

v.

TRAVELERS CLUB LUGGAGE, INC.

MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT

November 8, 2016

STEARNS, D.J.

Rimowa Distribution, Inc.,[1] a purveyor of luxury luggage, asserts that Travelers Club Luggage, Inc. (TCL), markets competing suitcases that misappropriate Rimowa's protected "distinctive pattern of ridges and grooves." Am. Compl. ¶ 1. Rimowa alleges trademark infringement and false designation of origin under the Lanham Act (Count I); trade dress infringement under the Lanham Act (Count II); common-law trademark and trade dress infringement (Count III); trademark dilution (Count IV); counterfeiting (Count V); and common-law unfair competition (Count VI). Discovery having been completed, TCL now moves for summary judgment

---

[1] Defendant Rimowa Distribution, Inc., will be referred throughout as Rimowa, whereas other Rimowa-named entities will be separately identified.

of no liability.   Rimowa, for its part, seeks brevis judgment on TCL's fraudulent procurement defense and counterclaim.

BACKGROUND

Rimowa's German corporate parent, Rimowa GMBH, is the record owner of Trademark Registration No. 2,583,912 (the '912 registration) on the Supplemental Register, and Trademark Registrations Nos. 3,949,886 (the '886 registration); 4,548,851 (the '851 registration); and 4,586,888 (the '888 registration) on the Principal Register.[2]   The '912 registration was issued on June 18, 2002, and depicts "a piece of luggage having parallel space ribs." The '886 registration was issued on April 26, 2011, and depicts "horizontal bands that run across and around the owner's luggage products."   The '851 registration was issued on June 10, 2014, and depicts "a three-dimensional design feature of the [luggage] goods consisting of parallel ridges and grooves that uniformly cover the surface of the goods."   The '888 registration was issued on August 19, 2014, and depicts "a 3D pattern of strait [sic] ridges and grooves that appear uniformly over the surface of the applicant's [luggage] goods."   The registrations state that the marks have been in use

---

[2] Marks registered on the Supplemental Register are "capable of distinguishing" the marked goods, 15 U.S.C. § 1091(a), while marks registered on the Principal Register have "become distinctive" of the marked goods, 15 U.S.C. § 1052(f).

since 1950, and were first used in commerce in the United States in 1985. The claimed marks of the '851 and the '888 are reproduced below.





The '851 registration.                    The '888 registration.

Rimowa asserts infringement of the four registrations as well as its "distinctive trade dress, consisting not only of the pattern of ridges and grooves, but also of the overall appearance of its luggage, including the placement and appearance of rollers and roller housing, handles, and trolley bars, locks, and corner protectors."  Rimowa's Response to TCL's Statement of Material Facts, Dkt. # 102 ¶ 1.  Rimowa identifies as infringing products TCL's Chicago, Jet Set, Nova, Bayhead, Orbit, Getaway, Atlas, Maze, Cerulean, Rio, and Sequoia Collections, the Lulu Castagnette line of luggage, and the lines designated with the serial numbers HS-27803, HS-27903, and HS-28103.  Am. Compl. ¶ 1.  Exemplars of Rimowa's luggage and TCL's accused Chicago and Orbit Collections are reproduced below.



Rimowa luggage (taken from Am. Compl. Ex. A).



TCL's Chicago Collection (taken from Am. Compl. Ex. C).



TCL's Orbit Collection (taken from Am. Compl. Ex. D).

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

*Standing*

TCL asserts that Rimowa lacks standing to bring the infringement claims because it is not an exclusive licensee of the asserted marks. Although the Lanham Act grants to the "registrant" the right to recover for trademark infringement, 15 U.S.C. § 1114, the First Circuit has interpreted the statute liberally to permit recovery by registrants, their assignees, and exclusive licensees. *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 158 (1st Cir. 1977). Rimowa became the exclusive licensee of the asserted marks in

the United States by virtue of a December 2014 compact with Rimowa GMBH.    Pursuant to the agreement, Rimowa acquired and possesses undivided rights to the marks within its grant of territory, including the right to sublicense and enforce the marks as it deems fit.

> Licensor hereby grants to Licensee an exclusive license . . . to use the Intellectual Property including any and all common law rights in the Territory in the manner specified in this License. . . . Licensor further agrees not to grant licenses to other parties to use the Intellectual Property within the Territory, Licensee shall have the right to grant sublicenses in the Territory.
>
> . . .
>
> Licensee shall . . . in its sole and absolute discretion and at its own expense challenge unauthorized use of [the Intellectual Property] or institute any proceeding deemed in its discretion desirable in order to protect the Intellectual Property.

Rimowa License (Dkt. # 83-8) ¶¶ 1, 5.1.

TCL challenges the exclusivity of Rimowa's license by pointing to a 2009 license agreement between Rimowa GMBH and Rimowa North America, Inc. (Rimowa NA), a Canadian subsidiary of Rimowa GMBH.  The agreement bestows on Rimowa NA "a non-exclusive license" for "all expertise and all necessary patents and proprietary rights . . . to manufacture polycarbonate [and aluminum] suitcase series of the brand RIMOWA," including for "distribution and sales . . . in the USA."  Rimowa NA License (Dkt. # 83-9) §§ 1.1, 2.1; Addendum.  The Rimowa NA License, by its own

6

terms, will expire on December 31, 2016. *Id.* at § 5.1.  Thomas Nelson, Vice President for Rimowa and Rimowa NA, explained that the Rimowa NA License was terminated prior to the Rimowa License (and that Rimowa NA is now sublicensed by Rimowa with respect to its United States sales). Nelson Aff. (Dkt. # 96) ¶¶ 3-4, 11-12.  TCL argues that the Rimowa NA License requires that any alteration of its terms be made in writing, § 7.1, and because Rimowa has not produced written confirmation of the termination of the Rimowa NA License, it follows that Rimowa is not the exclusive licensee of the marks in the United States.

This dispute, concerning the internal reorganization of the licensing scheme among the Rimowa family of companies, rings more of sounding brass and tinkling cymbals than of any tune of pragmatic consequence.[3]  The court need not make a determination whether Rimowa has standing to act as a sole plaintiff.  In the Rimowa License, Rimowa GMBH committed itself to "assist Licensee in the protection, whether by judicial means or otherwise, of the Intellectual Property," § 5.1, which is what this litigation is all about. Because the deficiency is one of form and not of substance, the court will

---

[3] There is no suggestion that any entity other than a Rimowa-named company has rights in the asserted marks.

permit Rimowa to amend its Complaint within fourteen days of the date of this opinion to add Rimowa GMBH as a co-plaintiff.

TCL also contends that because only an "owner" may seek to enjoin the dilution of a "famous mark" under the Lanham Act, 15 U.S.C. § 1125(c), as a licensee, Rimowa has no standing to assert such a claim. Although a few district courts have agreed with TCL, *see*, *e.g.*, *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 393 (S.D.N.Y. 2011), it is the view of this court that the counter-rationale set out in *Quabaug Rubber* is the more persuasive. In *Quabaug Rubber*, the Court, by analogizing to patents, held that an exclusive licensee may exercise the rights of an owner when it holds the monopoly on a mark within a given territory. 567 F.2d at 158-159. Because it holds the right to exclude others, grant sublicenses, and enforce the marks in United States, Rimowa stands in the shoes of the "owner" for all intents and purposes. Moreover, any lingering concerns over the niceties of ownership will be mooted by the joinder of Rimowa GMBH.

*Rimowa's Infringement Claims*

TCL maintains that Rimowa cannot prevail on its infringement claims because Rimowa has no evidence to support a finding of likelihood of confusion between the companies' competing lines of suitcases. Likelihood of confusion is "an essential element of a claim of trademark infringement,

whether asserted under Massachusetts or federal law." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486-487 (1st Cir. 1981). When assessing the likelihood of confusion, courts typically consider the so-called *Pignons* factors: "the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark." *Id.* at 487. Of the *Pignons* factors, "[e]vidence of actual confusion is often considered the most persuasive evidence of likelihood of confusion because past confusion is frequently a strong indicator of future confusion." *Beacon Mut. Ins. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 18 (1st. Cir. 2004). On the flip side, "an absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists." *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 4 (1st Cir. 1993).

The court agrees with TCL that Rimowa has failed to identify admissible evidence of actual confusion between Rimowa's luggage and the accused products. Although Rimowa asserts that it has been "contacted by consumers confused by [] look-alike luggage which had not been

manufactured by Rimowa, including consumers 'returning' to Rimowa lookalike luggage . . . manufactured by someone other than Rimowa," Rimowa Opp'n at 3, nothing in the record indicates that the "returned look-alikes" were manufactured by TCL.

Evidence of actual confusion, however, is not a precondition to establishing a likelihood of confusion. *Bose Corp. v. Ejaz*, 732 F.3d 17, 27 (1st Cir. 2013), citing *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992). The absence of actual confusion evidence is probative only where the competing products have durably coexisted in the same marketplace. The First Circuit has observed that

> a lack of evidence of actual confusion weighs against a finding of likely confusion when competing marks have competed in the same market for six years, [*Aktiebolaget*, 999 F.2d at 4], four years, *Pignons*, 657 F.2d at 490, or as little as three and a half years, *Keebler* [*Co. v. Rovira Biscuit Corp.*], 624 F.2d [366,] 377 [(1st Cir. 1980)].

*Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental*, 832 F.3d 15, 31 (1st Cir. 2016). TCL's Chicago Collection has been sold in the United States since November of 2013,[4] which, as of the date of the

_____

[4] TCL's Chief Executive Officer Peter Yu testified at his deposition that he was not familiar with operational details, such as the exact product lines on offer. However, in support of TCL's motion, he stated by affidavit that TCL has sold luggage products "very similar to the products currently sold under the Chicago Collection" since 2011. Yu Decl. (Dkt. # 82) ¶ 1. Yu does

publication of this opinion, is barely three years.  The remaining accused lines have been sold for significantly less time, if at all.[5]  Given the truncated periods of market coexistence, no negative inference can be drawn from the lack of actual confusion evidence.

TCL next argues that a consumer survey, conducted by its expert, Dr. Justin Anderson, confirms that there is no consumer confusion.[6]  The value of survey evidence turns on the design of the survey and the methodology used by the surveyor.  *See In Re Hotels.com, L.P.*, 573 F.3d 1300, 1305 (Fed. Cir. 2009).

> Under the "modern view,". . . surveys should be admitted as a general rule, and their weight should be determined by whether:
>
> (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was

not identify the earlier line, nor does he explain the basis for his opinion of similarity between the two lines.

[5] TCL alleges that some of accused lines have not (yet) been sold in the United States.

[6] TCL also faults Rimowa for the lack of survey evidence of its own. Although survey evidence is commonly offered to demonstrate a likelihood of confusion, it is not required, nor is it the exclusive method of proof.  *See Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 61 (1st Cir. 2008).

analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured.

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224-225 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999). Dr. Anderson selected as survey respondents approximately 700 individuals encountered in nine shopping malls in four regions of the country who indicated that they would likely purchase luggage sometime during the next year. After being shown a suitcase from the Chicago Collection, or another suitcase from a TCL line that do not have ridges and grooves (the latter serving as a control to remove "noise" from the results),[7] the respondents were asked for their opinion as to the origin of the suitcase. From the responses, Dr. Anderson concluded that his survey demonstrated net zero percent of consumer confusion.

While not dismissing Dr. Anderson's results altogether, the court agrees with Rimowa that Dr. Anderson's survey respondent universe was over-inclusive.

> The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case. Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.

---

[7] For about half of the participants, the suitcase was removed from sight prior to questioning; while the other half answered questions while looking at the suitcase.

6 McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed.).  "In an infringement action, 'the appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.'"  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487-488 (5th Cir. 2004) (citation omitted).  The case of *Weight Watchers International, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259 (S.D.N.Y. 1990), is illustrative.  *Weight Watchers* involved an alleged infringement of a diet food trademark.  The court found that a survey population of women who purchased frozen entrees while attempting to lose weight through diet and/or exercise was too expansive because it likely swept in women who were not interested in diet food and who were trying to lose weight through exercise alone.  *Id.* at 1272.  The proper universe, the court explained, would have been composed of purchasers of *diet* frozen entrees, the specific category of accused products.  *Id.*  Similarly, by surveying potential purchasers of luggage in the aggregate, Dr. Anderson's methodology did not differentiate consumers interested in hard-side suitcases (consistent with TCL's accused product lines), from persons who intended to purchase non-germane types of luggage, such as soft-sided suitcases, duffel bags, and

backpacks.[8,9]  Because of doubts whether the participants fairly represent a relevant segment of the consumer market, the court cannot accord Dr. Anderson's survey results any definitive weight.  *See Gillette Co. v. Norelco Consumer Prods. Co.*, 69 F. Supp. 2d 246, 262 (D. Mass. 1999) ("To be probative and meaningful . . . surveys . . . must rely upon responses by potential consumers of the products in question."), quoting *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981).

TCL finally challenges Rimowa's expert evidence on the remaining *Pignons* factors.  TCL contends that Rimowa's expert, Peter Paradise, lacks the qualifications to opine on the likelihood of confusion.[10]  Paradise has owned and operated a custom case maker and a regional luggage store chain

---

[8] TCL's rebuttal that the trademarks cover more than hard-sided luggage is unavailing – the proper universe includes purchasers of TCL's accused products.

[9] Rimowa also argues that Dr. Anderson's survey suffers from a number of other flaws, namely: that the survey did not accurately reflect the channels through which consumers purchase TCL luggage; that the survey did not include retailers in addition to ultimate consumers; that the survey did not accurately reflect market conditions; that the survey did not accurately assess point-of-sale confusion; and that the survey, by querying participants as to the manufacturer immediately after being shown suitcases prominently emblazoned with TCL's logo, was no more than a memory test.

[10] TCL also discounts Paradise's opinions because he is a friend of Thomas Nelson, Rimowa's Vice President.  Any alleged bias on the part of Paradise is an appropriate focus of cross-examination.

for over thirty years, and for more than twenty years has been an active participant in luggage trade associations.  While he has no experience with consumer surveys, as an industry insider, he is qualified to testify to several of the *Pignons* factors, including the relationship between the parties' channels of trade; the similarities between the parties' advertising campaigns; the classes of prospective purchasers; and the strength of Rimowa's mark.  Paradise's report explains that Rimowa has long used its ridge and groove mark and that its products are iconic; that Rimowa and TCL sell to retailers through the same Travel Goods Show; that they both sell to consumers through several of the same brick-and-mortar stores and online outlets; that both companies advertise in Travel & Leisure magazine, and use many of the same print, social media, and online advertising channels; and that the prices of the products overlap at the low end for Rimowa with the high end for TCL such that the products share similar classes of purchasers.

As for the similarity of the goods, there is no dispute that the Rimowa and TCL both sell the identical category of goods – hard-sided luggage. While Paradise did not engage in any substantive analysis of the similarity of the marks, this task involves a simple visual evaluation that can be easily

performed by the ultimate finder of fact.[11]  With respect to TCL's intent in adopting the marks, Rimowa has identified an email exchange between TCL and its Chinese supplier in which new product designs were touted for their style similarities to famous brands, including Rimowa.   Drawing all inferences in favor of Rimowa as the non-movant, the court finds that Rimowa has adduced sufficient evidence of a similarity between the companies' goods and marks, as well as an overlap between the competing markets, for the issue of the likelihood of confusion to be resolved by a jury.

*Rimowa's Dilution Claim*

Under the Lanham Act,

[s]ubject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).  TCL asserts that Rimowa's trademarks do not qualify under this provision because Rimowa has offered no evidence to establish

---

[11] For purposes of summary judgment, the court notes that TCL's accused luggage sports parallel ridges and grooves such that, despite the variations among the accused products, a jury could find each accused line to be similar to the asserted marks.

16

that its marks are "famous," and because Dr. Anderson's survey reflected little, if any, recognition of the mark.  A mark is famous in the context of a dilution claim

> if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.  In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii) The extent of actual recognition of the mark.
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).  In addition to Paradise's expert opinion that Rimowa luggage is iconic, Rimowa enjoys the statutory presumption that its marks on the Principal Register are "distinctive of the applicant's goods in commerce."  15 U.S.C. § 1052(f); *see also* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate . . . .").  Rimowa has also produced evidence that it has consistently used the marks

in commerce in the United States since 1985; that it has significant sales in the United States; and that it spends substantial resources both in advertising and enforcing its trademarks.  The court agrees with Rimowa that it has adduced sufficient evidence to raise a triable issue regarding the fame of its marks.

*TCL's Counterclaim/Defense of Fraudulent Procurement*

The parties cross move for summary judgment on TCL's counterclaim and defense of fraudulent procurement.   TCL alleges that Rimowa intentionally concealed U.S. Utility Patent No. 5,685,403 (the '403 patent) and U.S. Design Patent No. 563,101 (the '101 design patent) from the Patent and Trademark Office (PTO) during the prosecution of the '851 and '888 registrations to avoid the marks being rejected as functional.  *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) ("[T]rade dress protection may not be claimed for product features that are functional.").

> In order to establish a claim of fraud in the procurement of a federal registration, plaintiff must prove the following by clear and convincing evidence: (1) that defendant made a false representation to the PTO regarding a material fact; (2) that defendant knew that the representation was false; (3) that defendant intended to induce the PTO to act in reliance on the misrepresentation; and (4) the PTO was thereby deceived into registering the mark.

*Bay State Sav. Bank v. Baystate Fin. Servs., LLC*, 484 F. Supp. 2d 205, 220 (D. Mass. 2007); *see also In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir.

2009) ("[A] trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO.").

Rimowa GMBH is the record owner of both the '403 and '101 patents. The '403 patent was issued on November 11, 1997, and is entitled "Metal Suitcase and Method for Manufacturing a Metal Suitcase."

> In a metal suitcase (1) consisting of two suitcase halves (2, 4), each having a broad side (6a, 6b), two opposing narrow sides (8a, 8b), an upper side (10a, 10b) and a standing surface (12a, 12b). The suitcase halves (2, 4), in the closed condition, engaging each other by a frame (22) which extends along the narrow side (8a, 8b), the upper side (10a, 10b) and the standing surface (12a, 12b). The suitcase halves (2, 4) are pivotally connected to each other in the standing surface (12a, 12b). It is provided that each suitcase half (2, 4) is formed by two single piece wall elements (14a, 14b, 16a, 16b). The first wall element (14a, 14b) consists of a strip-shaped continuous cast profile having a wall-receiving profile (18) formed to one longitudinal edge and having a frame profile (20, 21) formed to the opposite longitudinal edge. The second element (16a, 16b) consists of a plate-shaped metal sheet.

'403 patent, Abstract. Although the '403 patent is not directed to suitcases of any particular appearance, the demonstrative figures of the patent depict a pattern of parallel ridges and grooves. The specification also reveals that the sides of the suitcase "are each made from a single piece plate which can be provided with a rib-shaped profile 25 having both a stiffening function and an aesthetic function." '403 patent, col. 3, ll. 17-19. The '101 design

patent offers a schematic of a wheeled suitcase with parallel ridges and grooves consistent with Rimowa's marks.

During the prosecution of the '851 and '888 registrations, the PTO Examiner advised that the marks might be rejected because they appeared functional, and requested "[a] written statement as to whether the applied-for-mark, or any feature(s) thereof, is or has been the subject of a design or utility patent or patent application."  PTO Office Action of May 8, 2013 (Dkt. # 90-2 at 254); PTO Office Action of May 9, 2013 (Dkt. # 90-3 at 185). George Dallmeyer, Rimowa GMBH's global intellectual property coordinating attorney, denied that the marks had been the subject of a design or utility patent.  *See* Response to May 8, 2013 Office Action (Dkt. # 90-2 at 119), Response to May 9, 2013 Office Action (Dkt. # 90-3 at 69).  Rimowa GMBH argued to the Examiner that its pattern of ridges and grooves was not functional, and submitted as support a 1985 load testing report to that effect. *See* Resp. to May 8, 2013 Office Action (Dkt. # 90-2 at 120), Resp. to May 9, 2013 Office Action (Dkt. # 90-3 at 71).  The PTO issued the '851 registration on June 10, 2014, and the '888 registration on August 19, 2014.

TCL asserts that because the '403 patent clearly establishes the functionality of the ridges and grooves, the PTO would not have issued the

registrations had it been informed of the patent.[12]   Furthermore, because Dallmeyer had drafted the '403 patent application, he was familiar with its contents and intentionally concealed it from the PTO.

As damning as the evidence may appear, the hurdle faced by TCL is high.

> A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. *W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.*, 54 C.C.P.A. 1442, 377 F.2d 1001, 1004 (1967).  Indeed, "the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Smith Int'l, Inc. v. Olin Corp.,* 209 USPQ 1033, 1044 (T.T.A.B. 1981).

*In re Bose*, 580 F.3d at 1243.  To constitute actionable fraud on the PTO, any misrepresentation must have a but-for materiality – that is, "one vital to overcoming the ground of rejection."  *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 886 (C.C.P.A. 1969); *see* 6 McCarthy on Trademarks and Unfair Competition § 31:67 (4th ed.); *cf. Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011) ("[A]s a general matter,

---

[12] According to TCL, Rimowa also concealed the '101 design patent because it discloses the asserted marks.  However, design patents by definition protect only ornamental and non-functional features of a product. *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997).

the materiality required to establish inequitable conduct is but-for materiality.").

TCL argues that the '403 patent is material because "[a] utility patent is strong evidence that the features therein claimed are functional." *TrafFix Devices*, 532 U.S. at 29. "'In general terms a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Id.* at 24, quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995). In *TrafFix*, the Supreme Court held that a trade dress for windproof signs that included two springs was functional because plaintiff could not overcome "the strong evidentiary inference of functionality based on the disclosure of the dual-spring design in the claims of the expired patents." *Id.* at 30. "[T]he central advance claimed in the expired utility patents . . . is the dual-spring design; and the dual-spring design is the essential feature of the trade dress [plaintiff] now seeks to establish and to protect." *Id.* In contrast, the '403 patent is not directed to ridges and grooves, but the construction of a suitcase whatever its exterior appearance.

TCL next argues that the '403 patent nonetheless establishes the utility of the ridges and grooves because it discloses that providing metal plates with a rib-shaped profile serves a "stiffening function." '403 patent, col. 3, l. 9.

> The fact that a product contains some functional elements does not, however, preclude Lanham Act protection.  "[A] particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1119 (5th Cir. 1991), *aff'd,* 505 U.S. 763 (1992).  The crucial inquiry is into the effect that granting protection will have on the opportunity of others to compete.

*I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 37 (1st Cir. 1998).  While ribbing in a metal plate may strengthen the material, the '403 patent does not disclose that the specific pattern of ridges and grooves claimed in the marks has a utilitarian purpose.  An arbitrary pattern of functional elements may itself be non-functional.  *See Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 409 F. Supp. 2d 643, 650 (D. Md. 2006) ("In other words, while the buttons on the Leviton GFCI certainly have functional value, by no means does that preclude Leviton from asserting that their configuration or design is non-functional.  The element of arbitrariness required in *I.P. Lund Trading ApS,* moreover, is supported by the fact that other manufacturers of GFCIs use different configurations.").  Rimowa's asserted marks do not preclude the use of all patterns of ridges and grooves on luggage.[13]  It is also

---

[13] For essentially the same reason and in deference to the rule that marks on the Principal Register are entitled to a presumption of validity, *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782-783 (9th Cir. 2002), the court will also deny TCL's request for a finding that the asserted marks are functional as a matter of law.  That issue will be reserved for the jury to decide.  The parties also dispute the precise scope of the asserted marks.  TCL

worth noting that while the '403 patent suggests the functionality of ribbing in metal plates, the asserted marks are not limited to a specific material or method of manufacture.  Because the court does not find that the '403 patent clearly and convincingly establishes the functionality of the asserted marks, the fraudulent procurement claim fails as a matter of law.

ORDER

For the foregoing reasons, TCL's motion for summary judgment is DENIED.  Rimowa's cross-motion is ALLOWED.  The Clerk will set the case for trial on the next open civil jury trial date.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

contends that the marks are limited to the number of ridges and grooves as depicted; Rimowa maintains that the marks cover patterns with varying numbers of ridges and grooves.  The court notes the evident tension between the infringement and functionality issues – a generic pattern may be functional while a specific pattern may not.